160 N.J. Super. 419 (1978)
390 A.2d 151
STATE OF NEW JERSEY, PLAINTIFF,
v.
JAMES JOYCE, WAYNE DeBELLIS, MORRIS HACKER AND MILES BURKE, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal).
Decided June 28, 1978.
*421 Mr. G. Michael Brown, Assistant Attorney General appearing for the State (Mr. John J. Degnan, Attorney General; Ms. Ileana N. Saros and Mr. Robert DeGeorge, Deputy Attorneys General, of counsel).
Mr. Francis J. Hartman, appearing for defendant James Joyce (Messrs. Hartman, Schlesinger, Schlosser & Faxon, attorneys).
*422 Mr. Charles H. Nugent appearing for defendant Wayne DeBellis.
Mr. Sal B. Daidone appearing for defendant Morris Hacker.
Mr. R. Alan Aslaksen appearing for defendant Miles Burke.
Mrs. Frances Goldmark Massie appearing for intervenor Trenton Times Corp. (Messrs. Jamieson, McCardell, Moore, Peskin & Spicer, attorneys).
Mr. Gerald A. Hughes appearing for intervenor Capitol City Publishing Co., t/a The Trentonian (Messrs. Levy, Levy, Albert & Marcus, attorneys).
IMBRIANI, J.C.C.
Defendants filed a motion for a pretrial evidentiary hearing to determine the audibility of recordings of conversations and the accuracy of transcripts made from such recordings, pursuant to State v. Driver, 38 N.J. 255 (1962), and State v. Zicarelli, 122 N.J. Super. 225, 238-240 (App. Div. 1973), certif. den. 63 N.J. 252 (1973), cert. den. 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973). Defense counsel and the State of New Jersey moved to exclude the news media from the courtroom. The news media entered an appearance to oppose the request. Should the news media be excluded from the courtroom during the pretrial hearing?
Defendants were charged in a 33-count indictment with the offenses of embracery, perjury, obstruction of justice, misconduct in office and conspiracy. The selection of the jury was to commence immediately following the pretrial hearing, which was estimated to take about one week.
One or more of the four defendants is a well known political figure in the Camden-Burlington County area *423 where the alleged offenses occurred. The indictment was returned by the statewide grand jury and the venue of the trial is in Mercer County.
Defendants allege that their right to a trial by an impartial jury could be adversely affected by the publication of information on the recordings, which include statements that are inadmissible in evidence, nonrelevant comments of the personal affairs of one or more of the defendants, unkind comments about one or more public figures who are not parties to this litigation, and statements which may be generally categorized as indecent. It is anticipated that the case will have considerable public interest and will be extensively covered by the news media.
The issue presented is the recurring conflict between the right of a defendant in a criminal case to a fair trial by an impartial jury, as granted by the Sixth Amendment to the United States Constitution, versus the right of the news media to unfettered access and dissemination of everything that occurs in a courtroom, as protected by the First Amendment. Both are freedoms which, Mr. Justice Black in an oft-quoted observation said, are "two of the most cherished policies of our civilization, and it would be a trying task to choose between them." Bridges v. California, 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192, 201, 159 A.L.R. 1346 (1941).
The legality of the exclusion of the news media during court proceedings was recently discussed in depth in State v. Allen, 73 N.J. 132 (1977), which involved orders that arose during the trials of two unrelated murder cases. During one trial the court entered an order barring the "publication of inculpatory testimony taken outside the presence of the jury at evidentiary hearings held to determine the admissibility of said testimony." Id. at 135. During the second trial the court held a hearing out of the presence of the jury to ascertain the testimonial capacity of a witness, and ordered the news media "not to report anything *424 that transpired out of the presence of the jury until after the jury verdict." Id. at 137.
Both orders were held to be illegal.
Here, unlike Allen, we are dealing with a pretrial evidentiary hearing. This is significant because when dealing with a pretrial motion a trial court has available many more options to protect a defendant's right to a fair trial. Allen directed that before issuing a restraining order or excluding the media from the courtroom, the "trial court should first resort to other alternatives unless it concludes that they are not feasible or proper under the circumstances." Id. at 145. For instance, the "trial judge may order a change of venue, require a foreign jury or a continuance, or voir dire prospective jurors." Id. at 161.
This followed the holding in Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), where a prior restraint prohibiting the reporting of alleged confessions or other facts "strongly implicative" of the accused was struck down even though there was a risk that pretrial news accounts would have some adverse impact on the attitudes of those who might be called as jurors. The court emphasized that it could not "say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary". 427 U.S. at 569, 96 S.Ct. at 2807, 49 L.Ed. 2d at 703. Again, the emphasis was on the failure of the trial court to seek alternative solutions before ordering a restraint or exclusion from the courtroom.
With that admonition in mind, and prior to ruling on the motion to exclude, this court called the news reporters into its chambers, informed them of the motion, explored possible alternative solutions and sought their opinions of what would be an acceptable alternative solution. The court noted that recently in another county the court, counsel and news media were able to agree upon a procedure whereby the news reporters would be excluded from the courtroom *425 during a pretrial hearing. It was agreed that if the recordings were allowed into evidence during the actual trial, the news reporters would be given a copy of a transcript of the recordings. Since the transcripts were not available to members of the public who might be present in court, the news reporters in that case accepted this alternative solution. A similar arrangement was offered to the news media in this case.
The three newspapers involved herein are the Courier-Post, having a general circulation in the Camden-Burlington County area where the alleged offenses occurred, and the Trenton Times and Trentonian, both having primary circulation in Mercer County where the trial will be held. After reflection and review with their editors, all of the news reporters refused to accept any agreement which excluded them from the courtroom or restrained in any way the publication of court proceedings. They argued that any infringement would constitute an unconstitutional restraint on freedom of the press as secured by the First Amendment to the United States Constitution, and protected from invasion by state action by the Due Process Clause of the Fourteenth Amendment. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).
The court then considered other alternatives. One was that the court hold the Driver hearing after a jury was impaneled. In this way, it was suggested, the court would have direct authority over the specific jurors who will hear the case and could order them not to read newspaper articles or listen to radio or television broadcasts concerning the case. But would this merely whet the jurors' curiosity? And how would we know whether or not the jurors complied? Note similar expressions of doubt in State v. Allen, supra, 73 N.J. at 142. Perhaps the court could again interrogate the jurors. But what would a court do if several jurors heard radio accounts or read newspaper accounts which they say could affect their verdict? A mistrial would have double jeopardy *426 problems. The court rejected this alternative as unsatisfactory.
The court also considered holding the hearing in camera. While Allen said that if alternative solutions are not feasible, "upon a clear showing of a serious and imminent threat to the integrity of the trial, and with the express consent of the defendant, * * * consideration [should] be given to holding the evidentiary hearing in camera," State v. Allen, supra at 145, the court did preface that statement by saying that "[a]ssuming that an in camera evidentiary hearing is not contrary to First Amendment principles or any other relevant constitutional concept, it should be used with circumspection." Id. at 145 (emphasis supplied). Obviously there is nothing sacrosanct about an in camera hearing that would insulate it from the proscriptions of the First Amendment. Indeed, one of the major purposes of an in camera proceeding is to deny the news media access to information. Would it be arbitrary to hold that the news media may not be excluded from the courtroom, but if the court proceeding is given the magical designation of an in camera proceeding exclusion is permissible? Would it make a difference whether the in camera hearing was held in chambers, rather than the courtroom? These are yet unanswered questions.
Further doubt of the legality of an in camera proceeding when used to deny access by the news media to court proceedings appears in the recent case of Landmark Communications, Inc. v. Virginia, ___ U.S. ___, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), where a conviction of a newspaper for violating the state constitution and statutes by divulging the confidential proceedings of a state judicial review commission involving alleged misconduct by a state judge was reversed, in spite of many and cogent reasons for the secrecy of such proceedings.
Why risk using a procedure that may bear constitutional infirmities? Patently, its use would be justified only if there is not a better alternative.
*427 This court believes that Allen and Nebraska Press point to a more sensible solution. While these cases suggest that consideration be given to a change of venue, or use of a foreign jury or a continuance, these options are not acceptable here because they all involve delays and concomitant interferences with the administration of justice. But the voir dire of prospective jurors does not. It
* * * involves the least imposition on the State, the defense and jurors. It is a normal part of the trial process, and can be helpful not only in removing prejudiced persons from the jury, but also in assessing the need for a change of venue, a continuance, or a foreign jury. [State v. Allen, supra 73 N.J. at 161]
This court could voir dire prospective jurors to ascertain if any have read or heard of the testimony received in the pretrial Driver hearing. If any did and indicate that such information would prevent them from returning a fair and just verdict based solely upon the evidence adduced during the trial, they could be excused. Of course, the interrogation of the prospective jurors must be conducted in such a way as to avoid contamination of the pool of jurors from statements which may be made in open court by jurors who have read the newspaper accounts or heard radio or television accounts. This can be accomplished by individual interrogation of prospective jurors. See State v. Rios, 17 N.J. 572 (1955).
Mercer County is a relatively large county having a population of approximately 320,000. The jury panel will consist of approximately 120 jurors. Under these circumstances this court does not perceive that dissemination by the news media of evidence offered during the Driver hearing would result in a Sixth Amendment denial to defendants. Even if a prospective juror read an allegedly prejudicial newspaper account, this would not result in his or her automatic disqualification. The court could review the newspaper articles and decide whether "the newspaper articles of themselves prevented a fair trial or * * * so infected the minds of some of the jurors as to leave them biased against *428 the defendant." State v. Van Duyne, 43 N.J. 369, 386 (1961). The same reasoning would apply to radio or television accounts.
If the court is in error in its assumptions and finds during the jury selection that an unduly large number of prospective jurors have read or heard of the Driver hearing evidence and that their minds might be influenced by such information, the court could at that time consider other alternatives, to wit, order a change of venue, require a foreign jury, or continue the case for such a period of time as necessary to enable the impaneling of a jury which is not so infected.
The court initially approached this problem with the view that a clear and explosive confrontation between First and Sixth Amendment rights was presented. But is that really so? I think not. While it is clear that to exclude the news media from the courtroom for even a moment would result in an abridgement of their rights under the First Amendment, it is not equally clear that their presence in the courtroom during the Driver hearing will result in an abridgement of defendants' right to a fair trial as granted by the Sixth Amendment.
Before this court could conclude that the presence of the news media during the Driver hearing will result in prejudice to defendants and violate their Sixth Amendment rights, the court would have to speculate as to the existence of several facts: the information which the news media will actually disseminate; that prospective jurors will actually read the information in newspapers or hear it on radio or television accounts; that the information disseminated will be prejudicial, and that the prejudicial information will infect or influence the minds of the jurors to such an extent that they will be unable to render a fair and just verdict based solely upon evidence offered during the trial.
No one has offered any proof or evidence to demonstrate by a preponderance of the evidence, much less by clear and convincing evidence, that such facts will actually occur.
*429 These are the precise concerns expressed by Mr. Justice Brennan in his concurring opinion in the Nebraska Press case when he said:
* * * [a] judge importuned to issue a prior restraint in the pretrial context will be unable to predict the manner in which the potentially prejudicial information would be published, the frequency with which it would be repeated or the emphasis it would be given, the context in which or purpose for which it would be reported, the scope of the audience that would be exposed to the information, or the impact, evaluated in terms of current standards for assessing juror impartiality, the information would have on that audience. These considerations would render speculative the prospective impact on a fair trial of reporting even an alleged confession or other information "strongly implicative" of the accused. [427 U.S. at 599-600, 96 S.Ct. at 2822, 49 L.Ed.2d at 721-722]
For these reasons the majority concluded that the Nebraska Press trial court's determination that pretrial publicity had "a clear and present danger that * * * could impinge upon the defendant's right to a fair trial * * * was of necessity speculative, dealing as he was with factors unknown and unknowable." Nebraska Press Ass'n v. Stuart, supra, 427 U.S. at 563, 96 S.Ct. at 2804, 49 L.Ed.2d at 700 (emphasis in original). The problem with all prior restraints is that they require speculation as to the harm which will result from dissemination of news. New York Times Co. v. United States, 403 U.S. 713, 725-727, 91 S.Ct. 2140, 2147-2148, 29 L.Ed.2d 822, 831-832 (1971).
The mere cry of prejudice by a defendant does not automatically raise a Sixth Amendment issue. Indeed, since the news media could not be prohibited from disseminating a confession or "strongly implicative" admissions in the Nebraska Press case, this court cannot perceive on what basis it can exclude the news media during this pretrial evidentiary hearing which, at best, also will involve confessions or admissions from one or more of these defendants.
The recurrence of this issue suggests that when dealing with a case with great public interest, the possibility of a confrontation of the First versus Sixth Amendment rights *430 might well be reduced if pretrial evidentiary motions were to be held sufficiently in advance of a trial, or perhaps, in a county other than the one in which the trial will occur. However, this may require a court rule change since State v. Graham, 59 N.J. 366, 372 (1971) spoke disparagingly of the practice of holding pretrial evidentiary motions other than on the day the case is called for trial, except when specifically sanctioned by court rule.
The motion to exclude the press is denied.
(POSTSCRIPT: This opinion was completed after the jury was selected. It is interesting to note that what at the outset appeared as an explosive confrontation between the First and Sixth Amendment rights, when put to the acid test of reality, fizzled like a pricked balloon. Of the 102 prospective jurors voir dired only three read or heard anything about the case, even though the newspapers and radio stations carried almost daily accounts of the Driver hearing, which lasted six days, and several of the newspaper accounts bore what some would term sensational headlines.)