KATHERINE BATTISTA, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM NICHOLAS BATTISTA, III, DECEASED AND KATHERINE BATTISTA, INDIVIDUALLY, PLAINTIFF-RESPONDENT, v. PAUL OLSON, DEFENDANT-APPELLANT AND BOROUGH OF LEONIA, CARNEY CROSS, AND TODD CIESLAK, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued September 23, 1986—Decided October 16, 1986.

Before Judges MICHELS, SKILLMAN and LANDAU.

*Colleen M. Ready* argued the cause for appellant (*Lieb, Berlin & Kaplan,* attorneys; *Donald L. Berlin,* of counsel; *Colleen M. Ready* and *Donald L. Berlin,* on the brief).

*Lawrence Weintraub* argued the cause for respondent (*Weintraub, Abramson & Powers,* attorneys; *Lawrence Weintraub,* of counsel and on the brief).

The opinion of the Court was delivered by

MICHELS, P.J.A.D.

Defendant Paul Olson appeals from a portion of a final judgment of the Law Division that awarded plaintiff Katherine Battista, individually, and as Administratrix ad Prosequendum of the Estate of William Battista, III, deceased, compensatory damages in the sum of $30,000.

Plaintiff instituted this wrongful death action under *N.J.S.A.* 2A:31-1 *et seq.* seeking: (1) compensatory damages against defendant Borough of Leonia (Leonia); (2) compensatory and punitive damages against defendants Leonia and police officers Carney Cross, Todd Cieslak and Olson; and (3) compensatory damages against defendants John Crawbuck, Marion F. Crawbuck and George Crawbuck, for the death of her son, William Nicholas Battista, III, (Battista) on January 12, 1982. Plaintiff alleged that Battista's death resulted from defendants' negligent failure to summon medical assistance, despite having a duty to aid and knowledge of Battista's perilous condition.

Following trial, the jury found defendants Leonia, Cieslak, Olson and John Crawbuck negligent. However, because they determined that proximate causation had not been established as to defendant John Crawbuck, the jury apportioned 33% of the fault for decedent's death to Leonia, 17% to Cieslak and 50% to Olson. In addition, the jury fixed full compensatory damages to be awarded plaintiff at $60,000. Finally, Olson's negligence was found to be intentional, willful, wanton and/or malicious, and, accordingly, he was assessed punitive damages of $1,000,000.

After various challenges to the propriety of the jury verdict were made by Olson, final judgment was entered: (1) approving a settlement agreement entered into by plaintiff and Olson accepting the jury verdict in the amount of $1,000,000 for punitive damages; and (2) finalizing judgment in favor of plaintiff and against Olson in the amount of $30,000, together with interest thereon, for compensatory damages.

Olson now appeals solely from the compensatory damage award. He contends that the jury's award of compensatory damages was the result of passion, prejudice and mistake and was contrary to the weight of the evidence. He also argues that the trial court erred (1) in refusing to grant a mistrial which had been sought because of the appearance during trial of two newspaper articles discussing the case and because of the alleged misconduct of the jurors, and (2) in submitting the issue of damages to the jury.

We have carefully considered the record in light of the arguments presented and are satisfied that the evidence in support of the jury verdict with respect to compensatory damages is not insufficient, that the trial court's ruling on the motion for a new trial does not constitute a manifest denial of justice and that all issues of law raised are clearly without merit. *R.* 2:11–3(e)(1)(B), (C) and (E). However, further comment may be helpful with respect to some of defendant's contentions.

## I.

Preliminarily, we note that Olson has raised the issue of the impropriety of the jury's compensatory damage verdict for the first time on appeal. Although motions seeking a judgment notwithstanding the verdict or, in the alternative, a new trial on behalf of Cieslak and Olson were made after the jury verdict, no allegation was made therein that the jury's award of compensatory damages was against the weight of the evidence. Rather, the motions alleged that the trial court had erred in submitting the issue of punitive damages to the jury and that the jury's award of punitive damages was against the weight of the evidence. The issue of punitive damages is not, however, a ground raised in this appeal.

With respect to the appeal and review of matters dealing with jury verdicts, our court rules specifically provide:

> In both civil and criminal actions, *the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court.* The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law. [*R.* 2:10–1 (Emphasis supplied) ].

This rule has been reaffirmed by this court which has recognized that a contention "that the verdict was against the weight of the evidence is not cognizable on appeal [where] no motion for a new trial on that ground was made in the trial court." *State v. Perry,* 128 *N.J.Super.* 188, 190 (App.Div.1973), aff'd, 65 *N.J.* 45 (1974). Clearly, *R.* 2:10–1 applies here. Since Olson failed to petition the trial court for a new trial on the ground that the jury's compensatory damage verdict was against the weight of the evidence, we are precluded from considering this argument on appeal.

Moreover, even if the issue of whether the jury's compensatory damage verdict was against the weight of the evidence were cognizable on appeal, it lacks merit. The evidence presented to the jury was more than adequate to support the jury's findings that Olson was 50% negligent and that he was liable for $30,000 of the $60,000 award of compensatory dam-

ages. Olson's failure to act, despite being present at the Crawbuck residence during the first emergency call and having received Mrs. Crawbuck's second call for an ambulance, justified the jury in finding Olson primarily negligent in causing Battista's death. The jury was warranted in assessing the specified damages against him.

We turn next to the question of whether the compensatory damage award against defendant necessitated the granting of a new trial. *R.* 4:49–1(a) provides that in considering a motion for a new trial, the trial judge shall grant the relief sought if "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Because reasonable minds could accept the evidence presented at trial as adequate to support the jury's verdict, *Kulbacki v. Sobchinsky,* 38 *N.J.* 435, 445 (1962); *Hacker v. Statman,* 105 *N.J.Super.* 385, 391 (App.Div.1969), certif. den., 54 *N.J.* 245 (1969), the exacting standard set forth in *R.* 4:49–1(a) was not met in this case. There was no clear and convincing proof of a miscarriage of justice. Accordingly, even if this issue were cognizable on appeal, when the record is viewed in its entirety, the jury's compensatory damage verdict cannot be considered to be distorted or improper, in an objective sense, so as to manifest a plain miscarriage of justice. *Carrino v. Novotny,* 78 *N.J.* 355, 360 (1979); *Dolson v. Anastasia,* 55 *N.J.* 2, 6–7 (1969).

## II.

We also reject Olson's claim that the trial court's repeated refusal to grant a mistrial constituted a mistaken exercise of judicial discretion and amounted to a manifest denial of justice under the law. Our case law has recognized that a motion for mistrial is addressed to the sound discretion of the trial court. *Wright v. Bernstein,* 23 *N.J.* 284, 296 (1957); *Wyatt v. Curry,* 77 *N.J.Super.* 1, 11 (App.Div.1962). As the Supreme Court of

New Jersey has observed, "[t]he exercise of judicial discretion in ruling on a motion for mistrial involves the appraisal by the trial court of the probable effect of the objectionable [occurrence] on a fair trial." *Runnacles v. Doddrell*, 59 *N.J.Super.* 363, 367 (App.Div.1960). However, the trial court must exercise this discretion with great caution. *Wright v. Bernstein, supra,* 23 *N.J.* at 296.

> It is undesirable that a trial be aborted and that the parties be required to incur the expense attendant upon retrial. By the same token expedition should not be served at the expense of crippling the cause of one party or the other by permitting the intrusion of evidence which will serve to confuse the jury or cause it to reach its verdict by emotion rather than by reason. [*Runnacles v. Doddrell, supra,* 59 *N.J.Super.* at 367].

Because the ruling on a motion for mistrial is discretionary, it will not be disturbed on appeal absent a clear showing that the trial court has abused its discretion. *Greenberg v. Stanley*, 30 *N.J.* 485, 503 (1959); *Runnacles v. Doddrell, supra,* 59 *N.J.Super.* at 366. Thus, it is only when an error or irregularity

> patently fails to take into account the substance of a fundamental right of a party and *deprives the party of the essence of such right, in a way that is plainly ineradicable* either by an instruction or other action by the court subsequent to the motion for the mistrial, *[that] a mistrial must be granted as a matter of right.* [*Wright v. Bernstein, supra,* 23 *N.J.* at 296 (Emphasis supplied)].

A denial of a motion for mistrial in such a situation must be deemed a mistaken exercise of judicial discretion and, hence, "harmful error since such action by the court would clearly and unequivocally be a manifest denial of justice under the law." *Ibid.* (citing *Hartpence v. Grouleff,* 15 *N.J.* 545, 549 (1954)). Stated differently, a trial court's

> first-hand judgment in denying such a motion will not be reversed by a reviewing tribunal on a cold record, ... unless it so clearly appears from the printed page alone that the happening on which the motion was based was so striking that because of it one of the parties could not thereafter have a fair trial. [*Greenberg v. Stanley, supra,* 30 *N.J.* at 503.]

Mindful of the standard which governs the review of denials of mistrial motions, this court must first consider whether the publication of the two articles in the *Bergen County Record* during the course of the trial tainted the fairness of the

proceedings. Although both our Federal and State Constitutions guarantee *criminal* defendants "the right to ... trial by an impartial jury," *U.S. Const.*, Amend. VI; *N.J.Const.* (1947), Art. I, par. 10, there is no similar constitutional right accorded defendants in civil trials. Nonetheless, a "fundamental right of trial by a fair and impartial jury" in civil matters has been recognized by our courts. *Wright v. Bernstein, supra,* 23 *N.J.* at 294; *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61 (1951).

In scrupulously guarding this fundamental right, our Supreme Court has noted that:

[a] jury is an integral part of the court for the administration of justice and on elementary principles *its verdict must be* obedient to the court's charge, *based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences.* A jury can act only as a unit and its verdict is the result of the united action of all the jurors who participated therein. *Therefore, the parties to the action are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences. [Panko v. Flintkote Co., supra,* 7 *N.J.* at 61 (Emphasis supplied)].

Thus, because an unprejudiced jury is integral to a fair trial, the triers of fact must be "as nearly impartial 'as the lot of humanity will admit.'" *State v. Singletary,* 80 *N.J.* 55, 62 (1979) (quoting *State v. Jackson,* 43 *N.J.* 148, 158 (1964), *cert.* den. *sub. nom., Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965)).

Newspaper articles and other related publicity may prove so inimical to a defendant's right to a fair trial as to warrant a mistrial. In *State v. Van Duyne,* 43 *N.J.* 369, 384–385 (1964), *cert.* den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965), several articles discussing a case appeared in the local press on days when the jury for that case was being selected. Moreover, copies of newspapers carrying these articles were present in the jurors' assembly room. Nonetheless, the trial court denied three motions for a mistrial. The trial court grounded these denials on its belief that liberal interrogation of prospective jurors "to ascertain if the articles had been read and [if they] would influence them [the jurors] in any way against the defendant" would provide an adequate safeguard for a fair

trial. *Id.* at 384. Through the *voir dire* process, it was learned in *Van Duyne* that some of the prospective jurors had, in fact, read the allegedly prejudicial articles. Those who indicated that they had formed an opinion about the guilt of the defendant were excused, while others who swore that they would decide the case solely on the evidence presented at trial were accepted as jurors.

On appeal, the defendant in *Van Duyne* expressed "grave doubt that jurors who [were] subjected to pretrial publicity seriously adverse to [his] interests [could] efface it altogether from their conscious and unconscious minds, no matter how hard they tr[ied] to do so." *Id.* at 385–386. In considering this contention, the Supreme Court opined that the law must be sympathetic to that viewpoint and, accordingly, trial judges must:

> analyze and evaluate carefully the words, attitude and demeanor of the juror when he asserts an impartial mind and one which is free from prejudice regardless of the improper newspaper publicity. If, in spite of the disavowal, the trial court has any lingering doubt about the juror's capacity for impartiality, he should be excused from service. [*Id.* at 386].

The *Van Duyne* court likewise explained that, on appeal, a reviewing court is "under a duty to make an independent evaluation of the facts and circumstances and of the juror's *voir dire* examination." *Ibid.* The Court directed that the appellate tribunal

> determine for itself whether the pretrial newspaper stories are so pervasive and so prejudicial, or the juror's protestation of unaffected impartiality after reading them so unconvincing or doubtful that a new trial should be ordered. [*Ibid.*]

Since the *Van Duyne* court's independent study of the record did not reveal "sufficient evidence that the newspaper articles of themselves prevented a fair trial or that they so infected the minds of some of the jurors as to leave them biased against the defendant," *ibid.*, the Court concluded that the trial court's denial of the motions for mistrial was proper and no reversal was necessary. *Id.* at 386, 390.

Additional guidance on whether a jury's outside knowledge of a case requires granting a mistrial is provided by *State v. Sugar*, 84 *N.J.* 1 (1980). In *Sugar*, the Supreme Court held that while the right to a fair trial may require a panel of impartial and indifferent jurors, "the jurors actually empanelled need not be ignorant of the facts of the case." *Id.* at 23. *See also State v. Joyce*, 160 *N.J.Super.* 419, 427 (Law Div.1978), overruled on other grounds in *State v. Williams*, 93 *N.J.* 39, 71 n. 19 (1983) (even if a prospective member of the jury has read an allegedly prejudicial newspaper account, this would not result in his automatic disqualification). Writing for the *Sugar* court, Justice Pashman observed that:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.* [84 *N.J.* at 23 (Citations omitted) (Emphasis supplied)].

In the *Sugar* court's view, discerning use of the *voir dire* "is a reliable means of eliminating prejudiced jurors." *Ibid.*

■ We begin our analysis of the instant case by noting the allegedly prejudicial articles and the steps taken to counteract their potential impact by the trial court. The article of June 21, 1984, entitled "Police Let Drunk Die, Witness Says," explained that "a suit was filed by Katherine Battista, the dead man's mother, who contends that the Leonia Police Department, the Borough of Leonia and the Crawbuck family were negligent in the case. She is seeking $1,000,000.00 in damages." The second article, appearing one week later, was headlined "MD Faults Cops in Student's Death". On the first full day that testimony was heard, the trial court cautioned the jurors that they were "to try this case based on what [was] said from the witness stand and in th[e] Courtroom." The judge specifically admonished, "[D]o not read any accounts in the newspapers about this case." This instruction was repeated when the jurors were questioned about the newspaper article of June 21, 1984, and

the jurors were generally reminded of the instruction at the conclusion of testimony on several subsequent days of trial.

Examining the record presented on appeal, we conclude that Olson's fundamental right to a fair trial and impartial jury was adequately protected. Since the full texts of the June 21, 1984, and June 28, 1984, newspaper articles are not part of the record, it is impossible for this court to ascertain independently if the newspaper articles themselves had the capacity to prevent a fair trial or infect the minds of jurors so as to bias them against Olson. However, the record does include the transcript of the *voir dire* of the jurors conducted after the publication of the June 21, 1984, article and the repeated cautionary instructions given by the trial court. This evidence, coupled with the lack of proof that any of the jurors who actually decided the case had read the disputed articles, convinces us that Olson was tried fairly by an unbiased jury. The trial court properly exercised its discretion in denying defendant's motions for mistrial. This result is reinforced by our Supreme Court's view that impartial jurors need not be ignorant of the facts of the case if they are able to lay aside any preconceptions and render a verdict based solely on the evidence presented in the courtroom. *State v. Sugar, supra,* 84 *N.J.* at 23.

### III.

Finally, Olson contends that the trial court erred in submitting the issue of compensatory damages to the jury. Olson bases this argument on plaintiff's inability to establish the condition her son would have been in had he survived the respiratory arrest which ultimately caused his death. Plaintiff's expert, Dr. Clifford J. Simon, a physician specializing in internal medicine and pulmonary disease, testified as to this matter. Dr. Simon was of the opinion that because Battista was in good general health, had a good pulse and was apparently still alive at 4:00 a.m. on January 12, 1982, if Battista had been immediately taken to the hospital and given proper atten-

tion he would have survived the respiratory distress. This opinion was not disputed, as none of the defendants presented expert medical testimony.

On cross-examination, Dr. Simon was questioned about the residual harm which Battista would have suffered from this incident, even if he had been "treated correctly" when the police first arrived at the Crawbuck home. In response to this inquiry Dr. Simon replied:

> [H]e would have survived at that time when he was first seen. *As far as possible residual ... damage from this incident, I don't think I or anybody else could tell you with any certainty.* (Emphasis supplied).

When pressed, Dr. Simon speculated that, if Battista was in shock and was hypertensive, he might have sustained damage to any organ system in his body, including his brain, heart, kidneys, liver and skin. However, Dr. Simon noted that there was no way of determining what the actual damage would have been since "[i]t would depend on how long the insult was, how severe [it] was, and how rapidly it was corrected."

Defendant now contends that the inability of plaintiff's expert to state what Battista's condition would have been had he survived, made it impossible for the jury to discern if the officers' failure to summon an ambulance or the decedent's ingestion of alcohol and various drugs was the proximate cause of death. Moreover, Olson asserts that plaintiff's failure to establish what decedent's condition would have been had he survived, precluded a finding that Olson's conduct was a substantial factor contributing to Battista's death.

In this wrongful death action, plaintiff is entitled to recover from Olson if the death of her son was a proximate result of Olson's negligence. Proximate cause has been defined generally as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and *without which the result would not have occurred." Fernandez v. Baruch,* 96 *N.J.Super.* 125, 140 (App.Div.1967), rev'd on other grounds, 52 *N.J.* 127 (1968) (Emphasis supplied). Stated differently, plaintiff must show

that defendant's conduct constituted a cause in fact of decedent's death because an act or omission is not regarded as a cause of an event if the event would have occurred without such act or omission. *Kulas v. Public Service Electric and Gas Co.*, 41 *N.J.* 311, 317 (1964); *Henderson v. Morristown Memorial Hospital*, 198 *N.J.Super.* 418, 428–429 (App.Div. 1985), certif. den., 101 *N.J.* 250 (1985). *See also Prosser & Keeton, Torts*, § 41 at 265 (5th ed. 1984). This rule has been tempered by cases holding that, even if damage would have occurred in the absence of a defendant's negligence, liability may be imposed upon a showing that the negligent conduct was a *substantial factor* in causing the harm alleged. *State v. Jersey Central Power & Light Co.*, 69 *N.J.* 102, 110 (1976); *Henderson v. Morristown Memorial Hospital, supra*, 198 *N.J. Super.* at 429. This "substantial factor" exception to the general rule of proximate causation rests largely on our courts' acceptance of the following tort principles:

[An] actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm.... [*2 Restatement, Torts* 2d, § 431 at 428 (1965)].

\*    \*    \*    \*    \*    \*    \*    \*

(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.

(2) *If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.* [*Id.*, § 432 at 430 (Emphasis supplied)].

These principles are particularly applicable here, where causation is based on a defendant's omission to act. In such a situation "[o]ur concepts of causation for failure to act are generally expressed in terms of whether the conduct may be viewed as a 'substantial factor contributing to the loss.'" *Hake v. Manchester Township*, 98 *N.J.* 302, 311 (1985). *See also Francis v. United Jersey Bank*, 87 *N.J.* 15, 44 (1981) (in order for liability to be imposed, the act or failure to act must be a substantial factor in producing the harm).

The Supreme Court's decision in *Hake v. Manchester Township, supra,* is instructive on the issue of causation in cases where a death allegedly resulted from a negligent failure to act. In *Hake,* a wrongful death action was brought by the decedent's parents against a municipality, its chief of police and various police officers. Plaintiffs charged that defendants' negligent conduct was a contributing factor in the suicide-death of their seventeen-year-old son at police headquarters. Decedent Robert Hake (Hake) was found unconscious, with a belt around his neck in a detention area where he had been placed to await his father's arrival at headquarters. After making this discovery, officers checked for a pulse but were advised by the chief of police that Hake should be left where he was until the Ocean County sheriff's and prosecutor's offices were contacted.

In their wrongful death suit, the Hakes sought to prove: (1) that the negligent supervision of their son while in defendants' custody contributed to cause the act of suicide; and (2) *that the defendants' failure to render prompt emergency care to the victim when discovered deprived him of a chance to be revived.* [98 N.J. at 304–305 (Emphasis supplied)].

The first issue was presented to a jury at trial and resolved in favor of defendants. On appeal, this jury verdict was left undisturbed by the Supreme Court. The second issue, which is pertinent here, was never presented to the jury because of evidentiary rulings by the trial court. However, on appeal, the Supreme Court reversed on this issue, and remanded for further proceedings relating to the claim of failure to provide prompt emergency rescue efforts. In reaching this decision, the *Hake* court determined that the decisive issue was causation, and offered valuable insight into the burden of proof in cases involving the omission to render emergency aid.

Writing for a unanimous court in *Hake,* Justice O'Hern recognized that courts have long struggled "to discover workable principles to resolve claims of a lost chance" since such tort claims involve "unique conceptual and analytical problems not presented in more typical negligence cases." *Id.* at 309. Such cases are especially complex because:

[w]hen a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he had put beyond the possibility of realization. *If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. [Id.* at 310 (Citations omitted) (Emphasis supplied)].

With respect to proof of causation in failure to rescue cases, the *Hake* court further noted that:

[c]ausation is proved if the master's omission destroys the reasonable possibility of rescue. (Citation omitted). *Therefore, proximate cause here is implicit in the breach of duty.* Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. *Once the evidence sustains the reasonable possibility of rescue,* ample or narrow, according to the circumstances, *total disregard of the duty, refusal to make even a try, as was the case here, imposes liability. [Id.* at 310–311 (Citations omitted) (Emphasis supplied)].

Thus, in cases involving the failure to give rescue assistance, "courts have generally let a jury find the failure caused the harm, though it is often a pretty speculative matter whether the precaution would in fact have saved the victim." *Id.* at 311 (citing 2 *Harper & James, The Law of Torts,* § 20.2 at 1113 (1956)). Embracing the "substantial factor" test, the *Hake* court concluded "that in establishing causation it suffices for plaintiffs to show that defendants' negligent conduct negated a substantial possibility that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing decedent's death." 98 *N.J.* at 306.

The holding in *Hake* is certainly applicable here. Plaintiff's proofs that Olson and the other defendants had a duty to aid in saving Battista's life and breached such duty were not disputed. Thus, in order to recover, plaintiff had only to show that there was a substantial possibility that Battista could have been rescued from death, had he been properly attended by Olson and the other defendants. The record establishes that a substantial possibility of saving decedent did in fact exist.

The trial testimony of Dr. Simon, which was not countered by a defense expert, clearly indicated that Battista would have

survived if he had been transported to the hospital at 4:00 a.m. on the day of his death. Pursuant to the standard enunciated in *Hake*, this evidence was sufficient to meet plaintiff's burden of proof on the issue of causation. As Dr. Stone's testimony regarding possible residual effects from respiratory distress implicitly recognized, "[w]here a case involves nonfeasance, no one can say 'with absolute certainty what would have occurred if the defendant had acted otherwise.'" *Id.* at 311–312 (quoting *Francis v. United Jersey Bank, supra*, 87 *N.J.* at 45). Thus, we conclude that there was adequate proof of causation in this case to submit the issue of damages to the jury and that the trial court did not err in so doing.

Accordingly, the portion of the judgment awarding plaintiff compensatory damages against defendant Olson under review is affirmed.