574 A.2d 411

THOMAS OLAH, EXECUTOR OF THE ESTATE OF LILLIANN OLAH, DECEASED AND STEVEN OLAH AND ROBIN OLAH KENNEY AND JOSEPH KENNEY, HER HUSBAND, PLAIN-TIFFS-RESPONDENTS, v. HOWARD SLOBODIAN, M.D., DE-FENDANT-APPELLANT, AND REYNALDO BRETONES, M.D., STEVEN HODES, M.D., MADHO SHARMA, M.D., DR. COSTAN-ZA, JOHN DOE, RADIOLOGIST, DR. KADIWAR, RESIDENT, PERTH AMBOY GENERAL HOSPITAL, CAROL NATARO, NURSING SUPERVISOR, NURSE LOBACANSKI, AND JANE DOE, 1, 2 AND 3, EMPLOYEES OF PERTH AMBOY GENERAL HOSPITAL, DEFENDANTS.

Argued October 11, 1989—Decided May 24, 1990.

120

*Richard E. Brennan* argued the cause for appellants (*Shanley & Fisher,* attorneys).

*Dennis A. Drazin* argued the cause for respondent (*Drazin and Warshaw,* attorneys; *John R. Connelly, Jr.,* on the brief).

*Joan Bannan Lorio* submitted a brief on behalf of *amicus curiae,* New Jersey Medical Malpractice Reinsurance Association (*Francis & Berry,* attorneys; *Hugh P. Francis,* of counsel).

The opinion of the Court was delivered by

STEIN, J.

In this case, as in *Scafidi v. Seiler,* 119 *N.J.* 93, 574 *A.*2d 398 (1990), also decided today, we consider application of the doctrine of increased risk, *see Evers v. Dollinger,* 95 *N.J.* 399,

471 *A*.2d 405 (1984), in medical-malpractice litigation. The primary issue in this appeal is the correctness of the trial court's instruction to the jury on the causal relationship between the alleged negligence of the defendant-physicians and the patient's death. The trial court instructed the jury that proximate cause would be established if it found that defendant Slobodian's failure to perform an endoscopy increased the risk of harm to plaintiff's decedent and, in combination with other factors, was a substantial factor in causing her death. In an unreported opinion, the Appellate Division held that the charge "correctly recognized the applicability of the 'increased risk' doctrine," but constituted reversible error in failing also to inform the jury that causation is established if there was a "substantial possibility" that the decedent could have survived if properly treated. We hold that the trial court's instruction was correct, but we remand for retrial on other grounds.

I.

On November 29, 1983, defendant Howard Slobodian performed surgery on Lilliann Olah to drain a pancreatic pseudo-cyst. The surgical procedure established a "window" in the stomach wall to allow built-up fluids to flow from the pseudo-cyst into the stomach. Mrs. Olah was discharged from the hospital on December 6, 1983. There is no allegation of negligence in the diagnosis of or the surgery on the pseudo-cyst.

On December 14th, paramedics took Mrs. Olah back to the hospital after she had collapsed in her bathroom. She was suffering from nausea, epigastric and lower-back pain, and weakness. Dr. Bretones, Dr. Slobodian's associate in medical practice, admitted Mrs. Olah and made a tentative diagnosis of bleeding of the upper gastrointestinal tract. He ordered two units of whole blood and Mrs. Olah was stabilized.

On December 15th, Dr. Bretones again examined Mrs. Olah, noting that her condition had improved. The following day, December 16th, Dr. Slobodian attended Mrs. Olah. That was

the only day during that hospital stay that Dr. Slobodian saw her. He found her condition improved, prescribed oral medication, and increased her diet. He and Dr. Bretones consulted and agreed that a "GI workup," to determine the source of Mrs. Olah's bleeding, should be scheduled after Mrs. Olah was feeling better.

On December 17th, 18th, and 19th, Dr. Bretones again visited Mrs. Olah and found her condition steadily improving. The December 19th progress report notes no pain, no fever, and "much" improvement. Mrs. Olah was discharged on December 19th.

When she got home from the hospital, Mrs. Olah's nausea returned. She ate crackers to try to settle her stomach. On the morning of December 20th, Mrs. Olah collapsed and vomited blood. Returned, once again, by ambulance to the hospital, she had no palpable blood pressure. Intravenous fluids restored her blood pressure to the palpable range. Informed of Mrs. Olah's condition, Dr. Slobodian responded, and found her being attended by the emergency room crew. He examined her, then consulted with a radiologist, who believed that an arteriogram would not be helpful, and consulted with Dr. Hodes, a gastroenterologist, who is also a defendant in this case.

Dr. Hodes arrived at the hospital at 1:00 p.m., saw the patient, and discussed with Dr. Slobodian the advisability of doing an endoscopy, a procedure that permits visual inspection of the stomach wall by means of fiberoptics. Both Dr. Slobodian and Dr. Hodes agreed that Mrs. Olah should undergo an endoscopy. The only question was when the procedure should be performed. Because emergency surgery was not contemplated, Dr. Hodes preferred to delay endoscopy until the patient had become stabilized. In the event bleeding recurred, however, he would perform the endoscopy on an emergency basis.

Mrs. Olah's condition remained fairly stable, even improved slightly, until just after four in the afternoon. Then she took a

dramatic turn for the worse. She developed a disorder of the blood-clotting mechanism called disseminated intravascular coagulapathy (DIC). The body, in response to a shock such as blood loss, reacts defensively by making the blood extremely clottable. During DIC, this extremely clottable blood begins, spontaneously, to clot in the smallest blood vessels. The formation of these clots throughout the body quickly uses up the clotting factors in the blood. Once that happens, the patient begins to hemorrhage and usually dies. Despite attempts to save her, Mrs. Olah died of blood loss on the evening of December 20th.

This suit for wrongful death centered on allegations that Dr. Slobodian and Dr. Hodes were negligent in their treatment of Mrs. Olah. A claim against Dr. Bretones was severed before trial. There were three distinct allegations of negligence against Dr. Slobodian and one against Dr. Hodes. Plaintiffs' experts testified that Drs. Bretones and Slobodian had negligently failed to recognize signs of continued instability and ongoing bleeding during Mrs. Olah's December 14th–19th hospitalization. Performance of diagnostic tests, including endoscopy, during that period might have led to discovery of the source of Mrs. Olah's bleeding. If the source of her bleeding had been discovered, surgery to repair the site of the hemorrhage would very likely have succeeded.

Plaintiffs' case in this regard was somewhat truncated by Dr. Bretones's absence from the proceedings. Because Dr. Slobodian was deemed not vicariously liable for the omissions of Dr. Bretones, the jury was permitted to consider only Dr. Slobodian's actions during his visit with Mrs. Olah on December 16th. The jury found no causal connection between any alleged negligence on December 16th and the patient's future suffering and eventual death.

Plaintiffs' second allegation was that Dr. Slobodian was negligent in not ordering endoscopy for Mrs. Olah between the hours of one and four in the afternoon on December 20th,

during the period when her condition had temporarily stabilized. The alleged negligence of Dr. Hodes also concerns the decision not to perform endoscopy during this period. Plaintiffs' expert testified that a patient with Mrs. Olah's immediate medical history might start hemorrhaging again at any moment, making it appropriate to perform an endoscopic examination during any period of stability.

Plaintiffs' third allegation was that it was negligent of Dr. Slobodian not to intervene surgically in order to save Mrs. Olah after the onset of DIC. Plaintiffs' expert testified that even after Mrs. Olah's blood had lost the capacity to clot, surgery was appropriate and inaction was negligent. The expert testified that without surgery she was bound to die, whereas surgical intervention offered at least a twenty-percent and possibly as high as a forty-percent chance of survival.

The most sharply disputed issue at trial concerned causation. Defendants argued that there was insufficient evidence for a jury to find that any of the alleged acts of negligence had, within a reasonable medical probability, caused Mrs. Olah's death. The trial court declined to submit to the jury the issue of Dr. Slobodian's alleged negligence in failing to perform exploratory surgery once DIC had set in, concluding that there was insufficient evidence to warrant its consideration by the jury. The court found, however, that sufficient evidence had been offered to submit to the jury the question of negligence during the December 14th–19th hospitalization, as well as the allegations of negligence in failing to perform an endoscopy between one and four in the afternoon on December 20th.

Charging the jury on the question of causation, the trial court applied a standard of causation derived from our opinion in *Evers v. Dollinger, supra,* 95 *N.J.* at 417, 471 *A.*2d 405. The court stated:

> Now, in the context of this case, the term "proximate cause" would have to mean that within reasonable medical probability the medical negligence, if you determine it to exist against the particular doctor for not scoping or causing the scope to be performed, that negligence increased the risk of harm to Lilliann

Olah such that it either directly brought about her death or was a substantial factor in her death in combination with other factors that were then occurring to her. There's two parts to that test. If you're satisfied that one or both of the doctors, as I've said, you're going to have to examine whether the one doctor and the other doctor was medically negligent, if you determine that he departed from the standard of practice expected of him, meaning that he was medically negligent in not having the scope done or doing the scope, then you're going to have to determine the issue of proximate cause, that is, whether that deviation increased the risk of harm occurring to Mrs. Olah, or to phrase it another way, deprived her of her chance of having an operation done which would stop the bleeding, and it would have to be such that this loss of the opportunity to have the operation, this increased risk of harm, was either such that it directly and by itself caused the death of Mrs. Olah or was a substantial factor in combination with other factors in bringing about her death.

During the course of deliberations the jury submitted the following question:

Would it be possible to compensate the family for a deviation from a standard of care in diagnosis and/or treatment of Lilliann Olah that was not a proximate cause of death?

The trial court responded that in order to compensate the plaintiff, there had to be both negligence and an injury. The court acknowledged that the injury need not be death, implying that "pain and suffering" is a form of injury, but emphasizing that in order for there to be recovery the negligence must cause an injury.

Shortly thereafter the jury returned its verdict, finding that Dr. Slobodian was negligent during the December 20th admission, that his negligence had not proximately caused Mrs. Olah's death but that it had caused pain and suffering, just compensation for which was $50,000. The jury found Dr. Hodes not negligent. The jury's verdict was in the form of responses to special interrogatories:

1A: Did Dr. Slobodien [sic] deviate from a standard of care in his diagnosis and/or treatment of Lilliann Olah?

A: Yes.

1B: Was such deviation a proximate cause of the death of Lilliann Olah?

A: No.

\*       \*       \*       \*       \*       \*       \*       \*

4A: Set forth that sum of money which will fairly, adequately and reasonably compensate for the pain and suffering of Lilliann Olah which were

proximately caused to her by the aforesaid medical negligence during December 16, 1983?

A:   No compensation.

4B:   Set forth that sum of money which will fairly, adequately and reasonably compensate for the pain and suffering of Lilliann Olah which were proximately caused to her by the aforesaid medical negligence during December 20, 1983?

A:   $50,000.

5:   Set forth the sum of money which will fairly, adequately and reasonably compensate the family survivors of Lilliann Olah for the past, present or future economic loss they have suffered due to the death of Lilliann Olah proximately caused by the aforesaid medical negligence.

A:   No compensation.

Immediately following the return of the verdict the trial court observed, out of the jury's presence, that the special interrogatories allowed the jury to award damages for pain and suffering without requiring a specific finding that defendant's negligence proximately caused decedent's pain and suffering.   Both the court and defense counsel expressed concern that the verdict was inconsistent, because the jury determined that defendant Slobodian's negligence did not cause death but nevertheless awarded damages for the pain and suffering antecedent to death based on the same negligence.

In order to enhance its understanding of the verdict, the trial court then submitted to the jury the question whether the negligence by Dr. Slobodian was a proximate cause of "some" injury.   Counsel for Dr. Slobodian objected to the court's supplemental question, contending that the verdict sheet reflected the jury's conclusion that there was a deviation but no proximate cause.   He characterized the court's question as a suggestion to the jury to "go back and decide * * * that they are talking about a proximate cause of pain and suffering."   After retiring to consider the question, the jury returned with a request for the court to define "injury."   The trial court responded that "injury could be a physical injury, whatever you understand that to be from the evidence, or some sort of mental suffering.   It can be either, but you have to find that it caused her some sort of injury in order to compensate her."   After

considering the matter anew, the jury determined that Dr. Slobodian's medical deviation was a proximate cause of "injury" to Mrs. Olah.

Defendant Slobodian moved for judgment notwithstanding the verdict and other alternate relief. Plaintiffs moved for a new trial on damages only. The trial court vacated the $50,000 verdict in favor of plaintiffs and ordered a new trial against defendant Slobodian, but only with regard to the hospital admission on December 20, 1983. In a letter opinion, the court explained:

[T]he court was and continues to be convinced that the verdict rendered may well have been tainted by the jury's misunderstanding of portions of the charge, particularly proximate cause of pain and suffering versus proximate cause of death or increasing the risk of death for Mrs..Olah. The disputed conduct of Dr. Slobodian on December 20 and the death of Lilliann Olah transpired over a matter of a few hours, with the turning point occurring somewhere around 4:00 p.m. To conclude that $50,000 is fair compensation for caused pain and suffering, but to also conclude that virtually the same conduct was not a cause of death, may very well be the footprints of compromise by the jury.

On plaintiffs' motion for reconsideration of this ruling, the trial court revised its prior determination and granted a new trial on all issues that had been submitted to the jury. The court then modified the order to the extent that it applied to Dr. Hodes, reasoning that no motion for a new trial against Dr. Hodes had been made within the ten-day period mandated by *Rule* 4:49–1(b), a time period which may not be enlarged. *R.* 1:3–4(a).

Before the Appellate Division, plaintiffs did not challenge the trial court's ruling withdrawing from the jury the allegation that Dr. Slobodian's failure to operate after Mrs. Olah contracted DIC contributed to her death. The Appellate Division reinstated the $50,000 damages award, but remanded the matter for a new trial limited only to the issue of the causal connection between Dr. Slobodian's December 20th negligence and Mrs. Olah's death. The court found ample support in the record for the jury verdict, disagreeing with the trial court's view that the

$50,000 damage award for pain and suffering was the product of "compromise or confusion."

The Appellate Division concluded that the causation issue required retrial, however, because the trial court's instruction was "incomplete." Although the trial court instructed the jury that liability will result from negligence that increases the risk of harm and is a substantial factor in causing harm, see *Evers, supra,* 95 *N.J.* at 417, 471 *A.*2d 405, the Appellate Division held that the charge constituted reversible error in omitting to instruct the jury that plaintiffs may recover if they demonstrate that there was a "substantial possibility that the decedent could have survived had she been properly attended to by defendant in a timely manner," citing *Hake v. Manchester Township,* 98 *N.J.* 302, 306, 486 *A.*2d 836 (1985).

Defendant Slobodian petitioned for certification, challenging both the reinstatement of the jury verdict and the modification of the causation charge mandated by the Appellate Division. Because the matter was interlocutory, we granted leave to appeal. 115 *N.J.* 67, 556 *A.*2d 1212 (1989).

## II.

In *Scafidi v. Seiler, supra,* we noted that the clear weight of authority in federal and state courts supports the use of a less stringent standard of causation in cases where a defendant's negligence increases the risk of harm already threatened by a preexistent condition. 119 *N.J.* at 107–112, 574 *A.*2d at 405–407. Adhering to our earlier decision in *Evers v. Dollinger, supra,* 95 *N.J.* at 417, 471 *A.*2d 405, we held that

> [e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result. [*Scafidi, supra,* 119 *N.J.* at 113, 574 *A.*2d at 408.]

Although the trial court's instruction to the jury on proximate causation, *Id.* at 125, 574 *A.*2d at 414, was essentially

consistent with both *Evers* and *Scafidi*, the Appellate Division concluded that it was "incomplete." Citing *Hake v. Manchester Township, supra*, 98 *N.J.* at 306, 486 *A.*2d 836, the Appellate Division held that the trial court committed reversible error in refusing to instruct the jury, despite plaintiffs' request, that plaintiffs were entitled to recover if they established that "there was a substantial possibility that the decedent could have survived had she been properly attended to by defendant in a timely manner."

Our holding in *Hake*, which was derived by analogy to cases involving allegations of failure to rescue a drowning seaman, *id.* at 310–11, 486 *A.*2d 836, is best understood in the context of the pertinent facts. Decedent's parents instituted a wrongful death action against Manchester Township and several of its police officers to recover damages for negligent conduct that allegedly contributed to the suicide death of their seventeen-year-old son at police headquarters. *Id.* at 304, 486 *A.*2d 836. Decedent was taken into custody on a charge of driving while intoxicated and retained in the "detention area" at the police station pending release to his father's custody. The detention area was a six-foot by twelve-foot multi-purpose room, adjacent to two cells, and used for fingerprinting and breathalyzer testing. One door from the detention area led to a hallway and the other to the radio room. *Id.* at 306–07, 486 *A.*2d 836. Decedent was last observed prior to his suicide between 4:35 p.m. and 5:00 p.m., by the on-duty dispatcher. *Id.* at 308, 486 *A.*2d 836.

At 5:05 p.m., a police officer found decedent unconscious, in a seated position on the floor, with his belt looped around his neck and secured to a bar on one of the cell doors. Decedent had no discernible pulse. The officer summoned his supervisor and the police chief, and asked if he should call the First Aid Squad and also whether he should "cut [decedent] down." The chief instructed the officer to leave decedent where he was, and to notify the county sheriff's office and the prosecutor's office,

specifically requesting a photo unit to respond. *Id.* at 308–09, 486 *A*.2d 836.

At trial, the plaintiffs attempted to prove that the police officers had breached their duty to render prompt emergency assistance. The plaintiffs proffered as an expert on police procedures a witness who was prepared to testify that "the proper procedure would have been to cut the person down immediately, call an ambulance, and administer cardiopulmonary resuscitation (CPR) until the ambulance arrived." *Id.* at 309, 486 *A*.2d 836. In addition, the plaintiffs proffered the expert testimony of the police dispatcher, who was trained and certified to administer first aid and CPR, and had been present when decedent was found unconscious. The dispatcher's testimony was offered to prove that there was a possibility of reviving decedent through prompt administration of CPR. *Id.* at 312–13, 486 *A*.2d 836. The trial court ruled that the proffered testimony was inadmissible in the absence of expert medical testimony that the emergency first-aid treatment would "probably" have saved the victim's life. *Id.* at 305–06, 486 *A*.2d 836. The Appellate Division affirmed in an unreported opinion.

We reversed and remanded for a new trial, holding that the expert testimony of a witness properly trained and certified in first-aid techniques was sufficient to establish that emergency-lifesaving procedures might have revived the decedent. In addition, we held that

> in establishing causation it suffices for plaintiffs to show that defendants' negligent conduct negated a *substantial possibility* that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing decedent's death. [*Id.* at 306, 486 *A*.2d 836 (emphasis added).]

However, in applying a "substantial possibility" standard to the facts of *Hake*, we explained that in "failure to rescue" cases, the concepts of causation and duty are intertwined. In such cases, "[t]he duty arises when there is a reasonable possibility of rescue." *Gardner v. National Bulk Carriers, Inc.*, 310 *F*.2d 284, 287 (4th Cir.1962), *cert. denied*, 372 *U.S.* 913, 83 *S.Ct.* 728, 9 *L.Ed.*2d 721 (1963).

The drowning-seaman cases, on which we relied specifically in *Hake*, illustrate clearly the relationship between duty and causation in a rescue context. In *Gardner v. National Bulk Carriers, Inc., supra*, 310 *F.*2d 284, a seaman reported missing at 11:30 p.m. had last been seen at 6:00 p.m. that evening. The master of the vessel notified the Coast Guard but otherwise took no steps to find the seaman, neither altering the speed or course of the vessel. Expert testimony at trial established that under the prevailing conditions, a person on the water "might have survived and been saved by a reasonable search," but the experts differed regarding "the lapse of time and distance within which a rescue operation had hope of success." *Id.* at 285. The trial court concluded that the master's failure to attempt a rescue had no causal relation to the seaman's death. The Court of Appeals reversed, holding that the existence of a reasonable possibility of rescue established *both* the duty to attempt rescue and the requisite causal connection between breach of that duty and the seaman's death:

> Proximate cause, the ship urges, has not been proved. Failure to reverse her course and conduct a search, the argument runs, does not of itself account for the death, since it has not been definitely shown that the man was alive and could have been saved. But this view ignores the underlying character of the duty. It was less than a duty to rescue him, but it was a positive duty to make a sincere attempt at rescue. The duty is of such nature that its omission will contribute to cause the seaman's death. The duty arises when there is a reasonable possibility of rescue. Proximate cause is tested by the same standard, i.e., causation is proved if the master's omission destroys the reasonable possibility of rescue. Therefore, proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of the duty, refusal to make even a try, as was the case here, imposes liability. [*Id.* at 287 (citation omitted).]

*Accord Kirincich v. Standard Dredging Co.*, 112 *F.*2d 163, 164–65 (3rd Cir.1940); *Harris v. Pennsylvania R.R. Co.*, 50 *F.*2d 866, 869 (4th Cir.1931); *Battista v. Olson*, 213 *N.J.Super.* 137, 151, 516 *A.*2d 1117 (App.Div.1986).

It is apparent that *Hake's* "substantial possibility" standard, which defines both duty and causation in rescue-type cases, is

not as appropriate for medical-malpractice cases as is the *Evers* test, which we endorse today in *Scafidi, supra,* 119 *N.J.* at 113, 574 *A.*2d at 408. In a malpractice context, the question of duty is usually uncontested, the physician ordinarily conceding the existence of a doctor-patient relationship. The question whether a patient has a "substantial possibility" of avoiding harm would ordinarily be subsumed in the jury's determination whether a defendant's deviation "increased the risk of harm from the preexistent condition." *Id.* at 113, 574 *A.*2d at 408. It is unlikely that a defendant's negligence would increase the risk of harm in the absence of a possibility of avoiding harm. Finally, the "substantial factor" segment of the *Evers* standard—which was retained by *Hake, supra,* 98 *N.J.* at 306, 486 *A.*2d 836—is well designed to focus the jury's attention on "whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Scafidi v. Seiler, supra,* 119 *N.J.* at 114, 574 *A.*2d at 408. Accordingly, we hold that the "substantial possibility" standard applied in *Hake* and other rescue cases should not be used by trial courts instructing juries in *Evers*-type medical malpractice cases.

## III.

■ The Appellate Division determined that there was no basis in the record for the trial court's conclusion that the jury's $50,000 verdict for decedent's pain and suffering constituted "a miscarriage of justice under the law." *R.* 4:49–1(a). Hence, it reinstated the verdict. Our review of the trial court's ruling, on which we apply essentially the same standard as that controlling the trial court, *Dolson v. Anastasia,* 55 *N.J.* 2, 7, 258 *A.*2d 706 (1969), leads us to conclude that the trial court was correct.

Concededly, the trial court's letter opinion explaining the setting aside of the $50,000 verdict, *supra* at 128, 574 *A.*2d at 416, did not rely expressly on the "miscarriage of justice"

standard set forth in *Rule* 4:49–1(a). The trial court expressed its concern about the apparent inconsistency between a verdict awarding $50,000 for pain and suffering and the jury's determination that the "same conduct" was not the proximate cause of death, suggesting that the verdict "may very well be the footprints of compromise by the jury." In addition, the court reiterated the concern expressed immediately after the verdict was returned, that the special interrogatories failed to require the jury to determine whether defendant's negligence was a proximate cause of decedent's pain and suffering. That omission, as noted above, *supra* at 127, 574 *A.*2d at 415, prompted the trial court to submit to the jury *after its verdict* the question whether defendant's negligence was a proximate cause of "some" injury, which the jury answered affirmatively. The obviously irregular procedure that required the jury to determine proximate causation *after* it had awarded damages was ample basis alone for the trial court's action. Combined with the facial inconsistency between the jury's determination that defendant's negligence was a proximate cause of decedent's pain and suffering but not of her death, the record provides clear and convincing support for the trial court's apparent conclusion that the jury verdict, under all the circumstances, constituted a miscarriage of justice. Accordingly, we reinstate the trial court's order vacating the jury verdict and granting a new trial on all issues submitted to the jury with respect to defendant Slobodian.

## IV.

■ Finally, we note that on remand plaintiffs' damage claim, consistent with our holding today in *Scafidi v. Seiler, supra,* 119 *N.J.* at 118–119, 574 *A.*2d at 410–411, shall be limited to the value of the lost chance for recovery attributable to defendant's negligence. Thus, assuming there is evidence in the record to support such an apportionment, the jury shall be instructed to determine the likelihood that decedent's injuries and death would have occurred even if defendant was faultless.

The trial court will mold any jury verdict to reflect that determination. *Id.* at 118–119, 574 *A.*2d at 411.

Judgment reversed; cause remanded.

HANDLER, J., concurring.

I expressed additional views by way of concurrence in the Court's opinion in *Scafidi v. Seiler,* 119 *N.J.* 93, 574 *A.*2d 398 (1990). These views I find equally germane to the Court's decision in this case and refer to them as the basis for my concurrence with its opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Opposed* —None.