USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1840

 CATEX VITOL GAS, INC.,
 Plaintiff, Appellee,

 v.

 STEPHEN RAY WOLFE,
 Defendant, Appellant.

 ____________________

 MICHAEL R. KUTSCH,
 Defendant, Appellee.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nancy J. Gertner, U.S. District Judge]

 ____________________

 Before

 Selya, Circuit Judge,
 Cudahy, Senior Circuit Judge,
 and Stahl, Circuit Judge.

 _____________________

 Pascal Paul Piazza, with whom Maurice Bresenhan, Jr. and
Zukowski & Bresenhan, L.L.P. were on brief, for appellant.
 Nicholas T. Christakos, with whom Joel E. Hoffman, Gail L.
Westover, Sutherland Asbill & Brennan LLP, Joan M. Griffin and
Casner & Edwards were on brief, for appellees.

 ____________________

 June 2, 1999
 ____________________ CUDAHY, Senior Circuit Judge. In 1994, Catex Vitol Gas,
Inc.(CVG) fired one of its executives, Stephen Wolfe. Wolfe now
appeals two orders granting summary judgment to CVG and its
president, Michael Kutsch, on claims and counter-claims related to
his termination. We affirm both orders.
 I.
 In 1991 Catamount, a Massachusetts natural gas company
owned by Kutsch, hired Wolfe to open and manage a branch office in
Houston. With the advice of counsel, Wolfe negotiated and signed
an employment contract. The particulars of this contract are at
issue here, so we recite them with some specificity. 
 Wolfe agreed to serve as a company Vice President from
March 1, 1991 until February 28, 1992 (Initial Employment Period).
According to 3 of the contract, Wolfe's tenure would "continue
from year to year thereafter and [could] be canceled by [Wolfe]
upon thirty days prior written notice." In consideration of his
services, the company paid Wolfe a $100,000 yearly base salary. 
Any increase in salary or additional compensation, such as a bonus,
was at the "sole discretion" of the company's Board of Directors. 
 The contract also outlined termination processes. 
Section 7.2 allowed Wolfe to terminate his employment "upon the
expiration of the Initial Employment Period in accordance with the
terms of this Agreement." Section 7.1 permitted the company to end
the relationship
 a) upon the expiration of the Initial
 Employment Period in accordance with the
 terms of this Agreement, (b) at any time
 without notice for "cause" as defined
 below, (c) at any time without notice
 without cause, subject to section 7.5
 below, (d) upon the death of the Employee,
 or (e) in the event of the Employee's
 disability . . .
Section 7.5 then defined what compensation would be due Wolfe upon
termination of his employment. It provided in full:
 Upon termination of the Employee's
 employment with the Company in accordance
 with clause (a), (b), (d) or (e) of
 Section 7.1, all compensation and benefits
 under this Agreement will cease, effective
 the date of termination. Upon termination
 of the Employee's employment with the
 Company in accordance with clause (c) of
 Section 7.1 prior to March 1, 1992, ("the
 Guaranteed Payment Date"), the Employee
 will be paid his Base Salary through such
 Guaranteed Payment Date in accordance with
 the Company's ordinary payroll practices. 
 Upon termination of the Employee's
 employment with the Company in accordance
 with clause (c) of Section 7.1 after the
 Guaranteed Payment Date, the Employee will
 be paid his Base Salary for thirty days
 after such termination in accordance with
 the Company's ordinary payroll practices. 
 Other than as specifically set forth in
 this Section 7.5 or as otherwise required
 by law, the Employee will not be entitled
 to receive any compensation or benefits
 after termination of his employment with
 the Company.

The contract also contained an integration clause, 11, which
provided:
 This Agreement constitutes the entire
 Agreement between the parties with regard
 to the subject matter hereof, superseding
 all prior understandings and agreements,
 whether written or oral. This Agreement
 may not be amended or revised except by a
 writing signed by the parties.

 Wolfe's tenure at Catamount proceeded without incident 
through the Initial Employment Period. Wolfe traded natural gas
for the company out of its Houston office and frequently traveled
to Boston to confer with colleagues. In 1992, the company, by this
time re-named Catex Energy Inc., instituted a Bonus and Guaranty
Plan (BGP) to provide "an incentive to selected key employees of
the Company similar to that to be derived from holding shares of
the common stock, no par value per share ("Common Stock"), of the
Company, but without transferring to such employees ownership of
any capital stock of the Company." The BGP is also at issue here,
so we limn its particulars as well. 
 The BGP allowed Kutsch to designate participants for a
given fiscal year and required each Participant to execute an
Accession Agreement for that year. Section 2(a) stated that "No
ownership of any capital stock of the Company will be transferred
or otherwise granted to any employee of the Company as a result of
the designation or participation of such employee as a
Participant." In the event of the sale of "all of the outstanding
Common Stock of the Company," 4(a) entitled BGP Participants to
some compensation which was to be determined by a precise formula. 
Section 11(d) further provided that if the BGP were terminated
prior to the end of a fiscal year and 4(a)'s stock sale
compensation provision were triggered within a year of that
termination, Participants would be entitled to compensation as
specified. Kutsch designated Wolfe as a BGP Participant for the
fiscal year 1992, and on June 12, 1992, Wolfe executed an Accession
Agreement in accordance with the terms of the BGP. Wolfe never
signed an Accession Agreement for the fiscal year 1993.
 On July 31, 1993, Kutsch sold 51 percent of Catex's
outstanding stock, all of which he owned, to Vitol Holding SARL. 
Prior to the closing and to facilitate the deal, on July 29, 1993,
Wolfe signed a Release and Waiver in which Kutsch agreed to forgive
a $25,000 balance on a personal loan, and Wolfe "irrevocably
release[d] and discharge[d] each of the Company, Kutsch and Vitol
from any and all liability of whatever description under or in
connection with the [BGP]." In the Release, Wolfe acknowledged
that he had reviewed acquisition documents which provided for a
$1,000,000 payment to Kutsch, $75,000 of which was intended to be
divided among the three former BGP Participants. Paragraph 1(e) of
the Release provided:
 The Acquisition does not constitute a
 Stock Sale (as defined in the [BGP]) or
 any other event or type of transaction
 contemplated by the [BGP] to require any
 payment to Participants. Moreover,
 neither the undersigned nor any other
 person has been designated as a
 Participant under the Plan for the
 Company's fiscal year ending December 31,
 1993. Nevertheless, Kutsch and the
 Company have determined to treat the
 [$75,000] as if it were being paid
 pursuant to the [BGP] and have undertaken
 in negotiating the [Acquisition] to ensure
 continuation after the Acquisition of the
 Company's informal discretionary bonus
 program for key employees in a manner
 consistent with the company's past
 practice.

In addition to signing this Release and Waiver, Wolfe initialed
paragraph 1(e). He consulted an attorney before executing this
Release.
 At a CVG Board of Directors Meeting on December 9, 1993,
the four attendees, one of whom was Kutsch, discussed a
Bonus/Incentive Plan (BIP) for 1994. The proposed program,
outlined in a short memo for the meeting, involved a cash component
linked to CVG's income, a deferred component vesting over four
years and a stock component allowing Kutsch to grant CVG employees
options to purchase his stock in the company. The minutes of this
meeting indicate that the Board of Directors believed that these
proposals would create an incentive for "key senior employees" to
stay with the company. The Board apparently "agreed" to the bonus
terms as outlined in the proposal memorandum. Nothing in the
record indicates whether CVG actually implemented the BIP or any of
its several components.
 Wolfe claims that in February or March 1994, Kutsch
approached him about devoting more of his time to developing new
business. In return, according to Wolfe, Kutsch promised Wolfe a
new method of compensation. Wolfe alleges that he and Kutsch
entered into an oral agreement, which changed Wolfe's bonus package
by adding a "profit center" component, a "new bonus" concept and a
vested ownership interest. These elements, according to Wolfe's
description, roughly correspond to the three component parts of the
BIP. This agreement also allegedly made parts of Wolfe's annual
bonus mandatory rather than discretionary. Wolfe claims that, in
reliance on this oral contract, he largely abandoned the client
base he had spent three years developing in order to concentrate on
bringing in new business for CVG.
 On March 28, 1994, CVG fired Wolfe without cause. This
termination was governed by 7(c) of Wolfe's original employment
contract which mandated that CVG pay Wolfe thirty days' base salary
as severance pay. CVG paid Wolfe ninety days' severance and
offered to determine at the end of fiscal year 1994 whether Wolfe
should receive a bonus for the three months of work before his
termination. Although his written contract did not so require, CVG
eventually granted such a bonus to Wolfe.
 Apparently anticipating Wolfe's dissatisfaction with this
severance package, CVG filed a declaratory judgment action in
Massachusetts state court seeking a determination that it did not
owe Wolfe anything more. Citing diversity of citizenship, 28
U.S.C. 1332, Wolfe removed the case to federal court and counter-
claimed against CVG and Kutsch. Wolfe first alleged that CVG had
breached a contract by failing to pay him the additional
compensation Kutsch had orally promised. Wolfe also stated a claim
sounding in fraud related to the Release and Waiver, contending
that Kutsch had misrepresented the value of the acquisition and
fraudulently induced Wolfe to abandon his stock rights under the
BGP. CVG moved for summary judgment on both its original action
and Wolfe's counter-claims. In an order dated June 27, 1997, the
district court granted CVG's motion with respect to Wolfe's breach
count. The court held that it could not enforce an oral
modification of a fully-integrated, written employment contract. 
The court allowed discovery into Wolfe's fraud allegation. About
a year later, in an order dated June 10, 1998, the district court
granted the remainder of CVG's motion for summary judgment. It
found that Wolfe could have suffered no injury from the alleged
fraud because, under the BGP and pursuant to the Release, he owned
no stock rights. Wolfe appeals both orders.
 II.
 We review an order of summary judgment de novo, employing
the same standards as the district court and viewing all facts in
the light most favorable to the non-moving party. See, e.g.,
Hinchey v. Nynex Corp., 144 F.3d 134, 140 (1st Cir. 1998). To
survive a summary judgment motion, the non-moving party must
produce sufficient evidence to raise a genuine issue of material
fact. See Fed. R. Civ. P. 56(e).
 A. Enforcement of the Oral Modification
 Wolfe first challenges the district court's refusal to
enforce the alleged oral modifications of his employment contract. 
He asserts, in sum, that CVG owes him money pursuant to his
agreement with Kutsch, which involved a profit center, a new bonus
structure and a vested ownership interest. The district court
looked to the four corners of the contract, several provisions of
which, it found, precluded enforcement of the alleged promises for
additional pay. Section 7.5, for example, provides that if Wolfe
were terminated without cause (as defined in 7.2(c)) after the
Initial Employment Period, as he was, then CVG owed him only thirty
days' base salary (it paid him ninety days') and any other 
compensation expressly included in the written contract. The
district court found no evidence that Wolfe's alleged bonuses had
been incorporated in writing in the contract. Further, 3
provided that all forms of compensation other than base salary were
at the sole discretion of the Board of Directors. Similarly,
because none of the other alleged modifications was in writing, and
 11 of the contract expressly required modifications to be in
writing, the district court refused to enforce them. Wolfe now
calls the district court's strict reliance on the language of the
employment contract an "unfounded legal fiction." Appellant's Br.
at 25; see also Appellant's Reply Br. at 2. 
 Under the principles of Erie R.R. Co. v. Tompkins, 304
U.S. 64, 78 (1938), Texas law supplies the substantive framework
for determining whether the district court's approach was as
fanciful as Wolfe claims. As a federal court sitting in
diversity, it is, of course, our task to interpret and apply as
best we can the state rules of decision. See, e.g., Blinzler v. 
Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). Relying
on pronouncements of the state supreme court and, if these are not
conclusive, on other instructive sources, ultimately "our task is
to ascertain the rule the state court would most likely follow
under the circumstances, even if our independent judgment on the
question might differ." Id. So guided, we beat our way through
the thicket of Texas contract law to determine the validity of
Wolfe's charge.
 Wolfe would plunge us deep into this briar patch by
raising various complicated issues of contract interpretation. He
would lead us close to cases limiting the significance of
integration clauses and canceling the strictures of the Statute of
Frauds. But we cannot be waylaid by such thorny issues; there is
a clearer path, and, although we could pick our way over Wolfe's
obstacle course, we take the safer route.
 Thus, the alleged oral modifications are unenforceable
because they are not sufficiently definite to supply the terms of 
a valid contract. The terms of an alleged oral modification to an
employment contract must be definite enough to allow a court to
know what it is being asked to enforce. See, e.g., Montgomery
County Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998);
Hathaway v. General Mills, Inc., 711 S.W.2d 227, 228-29 (Tex.
1986); Botello v. Misener-Collins Co., Ltd., 469 S.W.2d 793, 795
(Tex. 1971). "General statements" and "[g]eneral comments" will
not do; an employee "cannot construct [a formal agreement] out of
indefinite comments, encouragements, or assurances." Montgomery
County, 965 S.W.2d at 502. "In order to be legally binding, a
contract must be sufficiently definite in its terms so that a court
can understand what the promisor undertook." T.O. Stanley Boot
Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992).
 Here, the district court's characterization of Wolfe's
breach claim as "convoluted" is a masterpiece of understatement.
Even giving all reasonable inferences to Wolfe, as we must do on
summary judgment, the terms of the alleged oral modification are so 
indefinite and uncertain that Wolfe himself was unable to
articulate exactly what he was owed and under what formula the
extent of the deficit could be calculated. His deposition
testimony is telling. CVG questioned Wolfe about the basis for
his claim that he was owed bonus compensation:
 Q. Your claim for bonus, is that related to this
 written employment agreement?
 A. Yes.
 Q. Is your claim for a bonus related to any other
 agreement?
 A. The agreement we talked about the profit center
 agreement.
 Q. Anything other than that?
 A. Not under claim for bonus, no.
 Q. And then you say there's a profit center agreement. 
 Is that separate from the bonus?
 A. No. That's the same type program. . . .when
 Mr. Kutsch asked me to go out and seek a lot of new
 business on behalf of the company, he never
 predicated my payment of bonus based upon the total
 earnings of the corporation. I was told I would be
 paid based on my contribution to the company. . . .

App. 125-26. Wolfe's deposition testimony regarding his
understanding of the new bonus component was in the same vein:
 A. That particular program was an additional incentive
 compensation program very similar to the program in
 place at Vitol. It was fashioned after the Vitol
 plan, which effectively was a vesting program. For
 example, if my proportionate share of earnings
 amounted to $100,000 over and above my participation
 in the bonus plan, that $100,000 would be put into
 [sic] my name in the vested program, of which I
 would receive 25 percent in four annual
 installments, and that would also be terminated at
 any time if I left the company. I would be -- there
 would always be three years' payments that I would
 never recover if I ever left. So in effect over a
 period of time -- let's say if you had four years in
 a row, I mean, there could be sizeable sums of money
 built up in a deferred account that if you ever left
 the company you would walk away from. The effect of
 the program, to my understanding, was to make sure
 that the employees had significant incentive not to
 leave the company.
 Q. How would it be determined how much money any one
 person would be entitled to under that?
 A. I don't recall specifically the allocation
 procedures. I believe it was 10 percent of the net
 income. 10 to 20 percent of the net income of the
 company was allocated to this type of program. This
 is in addition to other bonus programs.
 Q. This is apart from the bonus concept?
 A. That's correct.
 Q. Under this program, as you think you understand it,
 when would the first payment have been made if you
 had remained with Catex?
 A. I believe the first payment would be due at the end
 of 1994.
 Q. And can you tell me again, as best you can, how that
 payment would be determined?
 A. I don't recall specifically. I think I gave you an
 adequate explanation.

App. 129-30. The questioning continued, and Wolfe was unable to be
any more precise about the specifics of the contract he was seeking
to enforce.
 The documents are similarly devoid of detail. The
memorandum -- entitled a "Proposed ... Plan" -- simply outlined
scales. For example, 25 percent of the deferred component (what
Wolfe calls the new bonus) would vest each year for four years from
the grant. The minutes from the Board of Directors meeting at
which the BIP was discussed indicate only that the Board "agreed"
to the proposed scale as a means of creating an incentive for
certain employees. Nothing in any document specifies what would be
paid to whom and when it would be paid. More, there is no
evidence to suggest that CVG took any steps to provide for the
implementation of any of the components of the BIP outlined in the
memorandum. The briefs and filings below are also less than
illuminating. 
 In order to enforce the oral modifications, Wolfe asks us
to fill in critical details. We would have to decide, for example,
what percentage of CVG's net income between 10 and 20 percent would
be allocated to the bonus program and, based on his "contribution
to the company," what part of that allotment CVG owed Wolfe. This
we cannot do. In the end, all of the sources which might flesh out
the terms of his alleged oral contract -- Wolfe's recollection of
the specifics of his agreement with Kutsch, the BIP memo, minutes
from Board of Directors meetings, etc. -- provide nothing more than
general and indefinite comments. Wolfe cannot forge a contract out
of such hazy materials. See, e.g., Montgomery County, 965 S.W.2d
at 502; Hathaway, 711 S.W.2d at 228-29. Accordingly, the oral
modifications are unenforceable. We therefore affirm the district
court's order of summary judgment in favor of Kutsch and CVG and
against Wolfe on Wolfe's breach counter-claim.

 B. Fraud in the Sale of Stock Rights
 We also affirm the grant of summary judgment against
Wolfe on Wolfe's fraud counter-claim. Wolfe alleges that Kutsch
fraudulently represented that Kutsch's sale of 51 percent of his
stock in the company would yield only $1 million when it in fact
resulted in Kutsch's receiving more than $10 million. Wolfe claims
that, in reliance on these false representations and under pressure
from Kutsch, he executed the Release and Waiver. In so doing he
allegedly relinquished his 2.5 percent stock interest in CVG for
substantially less than its true value. The district court
examined the language of the BGP and Release and concluded that
neither vested any ownership interest in Wolfe. It therefore held
that, even if Kutsch had fraudulently misrepresented the value of
the sale, Wolfe would be unable to show that he was injured -- he
had no stock rights to relinquish -- and summary judgment was in
order.
 We agree with the district court. In order to prove
actionable fraud, Wolfe must be able to show that Kutsch's conduct
caused him some harm. If Wolfe did not own rights to stock in the
first instance, Kutsch's representations about the value of the
merger, whether fraudulent or not, could not have injured him. 
There is no fraud in being induced to relinquish something you do
not have. See, e.g., Powers v. Boston Cooper Corp., 926 F.2d 109,
111 (1st Cir. 1991). 
 Wolfe forfeited nothing. None of the documents purports
to directly vest in Wolfe an ownership interest in the company. 
Indeed, to the contrary, all of the evidence suggests that Wolfe
never owned any stock in Catamount or its successors. Wolfe's
original employment contract does not provide for an ownership
interest, and the first section of the BGP expressly states that
its purpose was to create a financial incentive for participants
"without transferring to [the participants] ownership of any
capital stock of the Company." (emphasis added). Section 2(a) is
also unambiguous: "No ownership of any capital stock of the
Company will be transferred or otherwise granted to any employee of
the Company as a result of the designation or participation of such
employee as a Participant."
 As before, Wolfe is not discouraged by the clear, written
language of documents he signed; he forges ahead, offering 
numerous reasons why we should ignore this language. Only one
such reason merits our attention. Wolfe argues that 11(d)of the
BGP created "tail rights" which endured into 1993 and resulted in 
his acquiring stock rights. This argument suffers from many flaws. 
Section 11(d) provided that, if the BGP were terminated prior to
the end of a fiscal year and the stock sale compensation provision
of 4(a) were triggered within a year of that termination, then
former BGP participants would be entitled to compensation as if the 
BGP were still active. The BGP, however, was not terminated prior
to the end of a fiscal year; rather, it simply expired after only
one year on December 31, 1992. Kutsch never renewed the plan; he
never designated Participants for fiscal year 1993; and Wolfe (as
well as all the other former participants) never executed an
accession agreement for 1993. Moreover, 4(a) requires that "all
of the outstanding Common Stock of the Company [be sold] in a
single transaction." It is undisputed that Kutsch sold only 51
percent of his stock in the company. Thus, Wolfe's reliance on
 11(d) is to no avail.
 III.
 For the foregoing reasons, we AFFIRM the district court's
grant of summary judgment to CVG and Kutsch both on their claims
and on Wolfe's counter-claims.